IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT

26 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:12cr27 (GBL) |
| | ) | |
| YONATHAN MELAKU, | ) | |
| | ) | |
| Defendant. | ) | |

STATEMENT OF FACTS

Should this matter proceed to trial, the United States would prove the following beyond a reasonable doubt:

1.      From on or about October 17, 2010 to on or about November 2, 2010, in the Eastern District of Virginia, defendant YONATHAN MELAKU, on five separate occasions during the nighttime, fired multiple rounds from a 9mm semi-automatic pistol at various military-related sites in the Northern Virginia suburbs of Washington, D.C.  Specifically:

a. On or about October 17, 2010, between 12:30 a.m. and 7:30 a.m., the defendant fired ten 9mm rounds at the National Museum of the Marine Corps in Triangle, Virginia.  Melaku fired these shots from his 2001 Acura CLS automobile from a range of approximately 150 to 250 yards, while driving north on Interstate 95 (I-95).  Later that day, bullet holes caused by the defendant were found in several windows as well as on the base of the building.  The Museum is property of the United States government and is located within Prince William County;

b. Sometime during the early morning hours of October 29, 2010, the defendant returned to the area of the Marine Corps Museum and again fired shots at the Museum from his

vehicle while driving north on I-95 past the Museum. The bullets struck glass windows and a portion of the base of the Museum building. During this incident, MELAKU set up a video camera within the interior of his automobile so that he could record the shooting incident. A digital video tape recording of this incident was later recovered by law enforcement agents during a search of the defendant's residence. A review of the videotape showed MELAKU driving past the Marine Corps Museum, repeatedly firing a handgun from the vehicle out the passenger-side window. On the video **(an excerpt of which is attached as Exhibit 1),** MELAKU narrates the incident and states, among other things, the following:

> That's a military building and that's the building I'm going to be targeting. . . . Last time I hit them, they turned off the lights for like . . . four or five days. . . . Punks! Now, here we go again. This time, I'm gonna turn it off permanently. Alright. Alright, next time I turn on this video, I'm gonna be shooting them. That's what they get. . . . That's the target. That's the military building that's going to, gonna get attacked.

MELAKU then made some additional statements and began firing. At the conclusion of multiple shots, MELAKU exclaimed "Allahu Akbar" repeatedly.

c. The total cost for replacement of glass windows and repairs of other damage caused to the Museum from shots fired by MELAKU in both shootings was $94,109.83.

d. During the early morning hours of October 19, 2010, the defendant fired multiple shots from his 9mm semi-automatic pistol at the Pentagon, located within the Special Maritime and Territorial Jurisdiction of the United States, in Arlington County, Virginia. MELAKU fired these shots from his automobile in the vicinity of I-395, striking the south side exterior of the Pentagon between the first and fourth floors as well as individual windows on the third and fourth floors. Bullets penetrated the outer layer of the protective windows and were

2

trapped and did not penetrate the interior layer. The cost to repair damage to the windows and exterior of the Pentagon (including material, equipment and labor) was $15,144.00.

e. Sometime between the evening of October 25, 2010, and the early morning hours of October 26, 2010, the defendant fired shots from his 9mm semi-automatic pistol at the Marine Corps recruiting sub-station located at 13881 Metrotech Drive, Chantilly, Virginia. At least one window of the sub-station was damaged from the gunshots, causing a total of $1,365.15 in repairs.

f. Sometime between the evening of November 1, 2010, and the early morning hours of November 2, 2010, the defendant fired at least one shot from his 9mm semi-automatic pistol at the U.S. Coast Guard recruiting office at 2721 Potomac Mills Circle, Woodbridge, Virginia. The front door frame and locking mechanism were damaged, resulting in a cost of $597.00 for repairs.

2. On June 17, 2011, at approximately 1:30 a.m., defendant MELAKU was seen on the property of Ft. Myer in Arlington, Virginia and was approached by law enforcement officers from Ft. Myer. MELAKU fled on foot dropping a backpack. He was taken into custody on the property of Arlington National Cemetery. MELAKU had no forms of identification on his person and initially refused to provide any identifying information.

3. The backpack discarded by MELAKU was examined and contained, among other things, the following items: numerous spent 9mm shell casings; four clear Ziplock bags, each containing five pounds of ammonium nitrate (one of the most common components of homemade explosives); one can of black spray paint; two cans of Rust-Oleum; work gloves; a headlamp; and a spiral notebook with numerous Arabic statements referencing the Taliban, al

Qaeda, Osama bin Laden, "The Path to Jihad" including "defeat coalition and allies and America," as well as a list of several other individuals associated with foreign terrorist organizations. At the time MELAKU was apprehended, he was attempting to make his way to an area of the Arlington National Cemetery containing graves of deceased veterans of the U.S. military engagements in Afghanistan and Iraq. The Arlington National Cemetery is property owned by, and under the jurisdiction of, the federal government. Once at this location, MELAKU intended to desecrate and injure grave markers by spray-painting the markers with Arabic statements and by leaving the ammonium nitrate he was carrying at the sites of these grave markers.

4.      On June 17, 2011, MELAKU had stored within the bedroom closet of his Alexandria residence a typed list bearing the heading "Timer." As MELAKU well knew, the items on this list are consistent with what would be required to construct an electronic firing mechanism for an explosive device. The list contained the following numbered items:

1  9 volt alklaline [sic] battery
2  Battery connector for 9 volt
3  20 gauge insulated and stranded wire
4  electrical tape
5  epoxy or super glue
6  digital kitchen countdown timer
7  Bulb
8  LED light
9  Transistor

(Items 1, 4, 5, and 6 on this list were crossed through).

5.      A forensic examination and comparison by a Physical Scientist in the Firearms & Toolmarks Unit at the FBI Laboratory in Quantico, Virginia of bullets and/or bullet fragments recovered from each of the four locations where MELAKU fired shots -- including the October

4

29, 2010 incident in which MELAKU recorded himself shooting at the Marine Corps Museum for the second time -- conclusively established that all of the shots were fired from the same barrel, consistent with a 9mm semi-automatic pistol. Additionally, the forensic examination determined that 89 of the 95 submitted cartridge cases found inside MELAKU's backpack at the time of his June 17, 2011 arrest in Arlington Cemetery were extracted, following firings, from an Argentine FM M90 Hi Power 9 mm pistol, Serial Number 370952, owned by MELAKU. It was this particular firearm that MELAKU used in committing all five shootings described above.

6.      At all times during the above-described incidents, defendant MELAKU acted unlawfully and knowingly and not by mistake or other innocent reason.

Respectfully submitted,

Neil H. MacBride
United States Attorney

By: _____
Lynn E. Haaland
Assistant United States Attorney

W. Neil Hammerstrom, Jr.
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, YONATHAN MELAKU, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Yonathan Melaku
Defendant

I am YONATHAN MELAKU's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Gregory B. English
Counsel for Defendant

6