IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | CRIMINAL NO. 1:12cr27 |
| | ) | |
| | ) | Hon. Gerald Bruce Lee |
| YONATHAN MELAKU, | ) | |
| | ) | Sentencing date: January 11, 2013 |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING**

The United States of America, by and through its attorneys, Neil H. MacBride, the United States Attorney for the Eastern District of Virginia, and Lynn E. Haaland and W. Neil Hammerstrom, Jr., Assistant United States Attorneys, and in accord with the United States Sentencing Commission, *Guidelines Manual,* § 6A1.2 and the policy of this Court, files its position on the sentencing of the defendant Yonathan Melaku ("the defendant" or "MELAKU"). The United States respectfully requests that the Court sentence the defendant to a term of 25 years in prison in accordance with the January 26, 2011 plea agreement signed by the parties and entered by the Court in this case. The United States further requests that the defendant serve his sentence at a Bureau of Prisons inpatient psychiatric facility. Such a sentence appropriately accounts for the December 10, 2012 report by the Federal Medical Center FCC-Butner ("FCC-Butner report"), as well as the factors set forth in 18 U.S.C. § 3553(a).

**I.      BACKGROUND**

**A.      Factual Background**

From on or about October 17, 2010 to on or about November 2, 2010, in the Eastern

District of Virginia, the defendant, on five separate occasions during the nighttime, fired multiple rounds from a 9mm semi-automatic pistol at various military-related sites in the Northern Virginia suburbs of Washington, D.C. Specifically:

      a. On or about October 17, 2010, between 12:30 a.m. and 7:30 a.m., the defendant fired ten 9mm rounds at the National Museum of the Marine Corps in Triangle, Virginia, causing bullet holes in several windows and at the base of the building.

      b. Sometime during the early morning hours of October 29, 2010, the defendant returned to the area of the Marine Corps Museum and again fired shots at the Museum, striking windows and a portion of the base of the Museum building. During this incident, MELAKU set up a video camera within the interior of his automobile in order to record the shooting. A video tape recording of this incident was later recovered by law enforcement agents during a search of the defendant's residence. A review of the videotape shows MELAKU, wearing a ski mask, driving past the Marine Corps Museum, repeatedly firing a handgun from the vehicle out the passenger-side window. On the video (an excerpt of which was attached as Exhibit 1 to the Statement of Facts), MELAKU narrates the incident and states, among other things, the following:

> That's a military building and that's the building I'm going to be targeting. . . . Last time I hit them, they turned off the lights for like . . . four or five days. . . . Punks! Now, here we go again. This time, I'm gonna turn it off permanently. Alright. Alright, next time I turn on this video, I'm gonna be shooting them. That's what they get. . . . That's the target. That's the military building that's going to, gonna get attacked.

MELAKU then made some additional statements and began firing. At the conclusion of multiple shots, MELAKU exclaimed "Allahu Akbar" repeatedly. At a certain point in the video,

MELAKU believes that he may have been spotted by police, and therefore removes the ski mask so as to not draw attention to himself. The video continues to run and MELAKU is clearly identifiable.

   c. The total cost for replacement of glass windows and repairs of other damage caused to the Museum from shots fired by MELAKU in both shootings was $94,109.83.

   d. During the early morning hours of October 19, 2010, the defendant fired multiple shots from his 9mm semi-automatic pistol at the Pentagon, striking the south-side exterior of the Pentagon between the first and fourth floors as well as individual windows on the third and fourth floors. Bullets penetrated the outer layer of the protective windows and were trapped and did not penetrate the interior layer. The cost to repair damage to the windows and exterior of the Pentagon (including material, equipment and labor) was $15,144.00.

   e. Sometime between the evening of October 25, 2010, and the early morning hours of October 26, 2010, the defendant fired shots from his 9mm semi-automatic pistol at the Marine Corps recruiting sub-station in Chantilly, Virginia. At least one window of the sub-station was damaged from the gunshots, causing a total of $1,365.15 in repairs.

   f. Sometime between the evening of November 1, 2010, and the early morning hours of November 2, 2010, the defendant fired at least one shot from his 9mm semi-automatic pistol at the U.S. Coast Guard recruiting office in Woodbridge, Virginia. The front door frame and locking mechanism of the office were damaged, resulting in a cost of $597.00 for repairs.

  On June 17, 2011, at approximately 1:30 a.m., defendant MELAKU was seen on the property of Ft. Myer in Arlington, Virginia and was approached by law enforcement officers from Ft. Myer. MELAKU fled on foot dropping his backpack. He was taken into custody on the

property of Arlington National Cemetery. MELAKU had no forms of identification on his person and initially refused to provide any identifying information.

The backpack discarded by MELAKU was examined and contained, among other things, the following items: numerous spent 9mm shell casings; four clear Ziplock bags, each containing five pounds of ammonium nitrate (one of the most common components of homemade explosives); one can of black spray paint; two cans of Rust-Oleum; work gloves; a headlamp; and a spiral notebook with numerous Arabic statements referencing the Taliban, al Qaeda, Osama bin Laden, "The Path to Jihad" including "defeat coalition and allies and America," as well as a list of several other individuals associated with foreign terrorist organizations. At the time MELAKU was apprehended, he was attempting to make his way to an area of the Arlington National Cemetery containing graves of deceased veterans of the U.S. military engagements in Afghanistan and Iraq. Once at this location, MELAKU intended to desecrate and injure grave markers by spray-painting the markers with Arabic statements and by leaving the ammonium nitrate he was carrying at the sites of these grave markers.

A forensic examination and comparison by a Physical Scientist in the Firearms & Toolmarks Unit at the FBI Laboratory in Quantico, Virginia of bullets and/or bullet fragments recovered from each of the four locations where MELAKU fired shots -- including the October 29, 2010 incident in which MELAKU recorded himself shooting at the Marine Corps Museum for the second time -- conclusively established that all of the shots were fired from the same barrel, consistent with a 9mm semi-automatic pistol. Additionally, the forensic examination determined that 89 of the 95 submitted cartridge cases found inside MELAKU's backpack at the time of his June 17, 2011 arrest in Arlington Cemetery were extracted, following firings, from an

4

Argentine FM M90 Hi Power 9mm pistol, Serial Number 370952, owned by MELAKU.  It was this particular firearm that MELAKU used in committing all five shootings described above.

In a February 14, 2012 interview with the FBI, MELAKU stated that following the Fall 2010 shootings, he cut up the original barrel from the Argentine FM M90 Hi Power 9mm pistol he used to commit the shootings.  He threw the pieces down a number of street drains to avoid law enforcement tracing the weapon back to him.  In addition, he then sold the gun with a new barrel (again, to avoid law enforcement detection).  MELAKU later also sold his car used to commit the Fall 2010 shootings.

      B.      **Procedural Background**

On January 26, 2012, the defendant appeared before this Court and entered a knowing and voluntary pre-indictment guilty plea to a three-count criminal information charging him with: injury to property of the United States by shooting with a firearm and causing damage in excess of $1,000, in violation of 18 U.S.C. § 1361 (Count One); using, carrying and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and attempted injury to veterans' memorials on property of the United States, in violation of 18 U.S.C. § 1369 (Count Three).

Pursuant to Rule 11(c)(1)©, Federal Rules of Criminal Procedure, the defendant agreed to accept a total sentence of imprisonment of 25 years on all three counts.  Sentencing has been set for January 11, 2013.

Immediately after the defendant entered his guilty plea, counsel for the defendant made an oral motion for the defendant to be committed for a mental evaluation pursuant to 18 U.S.C. § 4244.  As directed by the Court, counsel for defendant subsequently filed a written motion for

said evaluation. The government filed a response in opposition, and the Court denied defendant's motion on March 23, 2012, finding that the motion was "not supported by substantial information indicating any mental disease or defect," as required by 18 U.S.C. § 4244(a).

On August 8, 2012, the Court granted Defendant's Motion for Reconsideration of Defendant's Request for Court Ordered Psychiatric Examination, following new information provided by the defense in the form of a May 21, 2012 letter from Neil Blumberg, M.D., that the defendant suffered from a mental illness. The Court further set a status conference on the defendant's mental condition on October 12, 2012.

On December 10, 2012, FCC-Butner filed a letter motion for extension of time in which to file their evaluation. On the same date, December 10, 2012, the Court granted the letter motion and ordered that FCC-Butner file its report no later than November 30, 2012. The Court further cancelled the December 10, 2012 status conference and set the matter for sentencing on December 14, 2012.

On Tuesday, December 11, 2012, the government received a copy of the FCC-Butner report on the defendant dated December 10, 2012. The FCC-Butner report concludes that the defendant "is presently suffering from a mental disease, namely Schizophrenia that requires his custody for care or treatment in an inpatient psychiatric facility, such as a Bureau of Prisons Federal Medical Center." Id. at 15.

The FCC-Butner report indicates that despite their conclusion that he needs treatment for a mental illness, the defendant should be sentenced. According to the December 10, 2012 cover letter by Craig Apker, Complex Warden, FCC-Butner, the defendant "is currently in need of custody and care or treatment in a suitable facility, and may be returned to Court for sentencing."

The FCC-Butner report itself states, "Mr. Melaku is ready to be returned to Court." Id. at 15. Moreover, the defendant himself apparently stated during an interview at Butner that "he would be willing to consider treatment after he is sentenced and designated to a prison." Id. at 12.

Sentencing was rescheduled for January 4, 2013, and subsequently January 11, 2013.

### C. The Defendant's Motives

In a February 15, 2012 interview, MELAKU explained that he had self-radicalized beginning in 2003 following the Iraq war. He stated that he planned the Northern Virginia shootings in order to send a message to U.S. authorities and to the public that "you can't be fighting over there" (meaning in Iraq and Afghanistan). He stated that he wanted people "to be afraid for supporting the war." MELAKU further stated that he decided to stop shooting at government buildings because his message was not being heard. He decided to escalate his activities and planned his trip to the Arlington National Cemetery in June 2011. He stated that he planned to desecrate the grave markers of U.S. veterans of the Iraq and Afghanistan conflicts because he disapproved of the United States waging war, as he perceived it, against Muslims. MELAKU explained that he had budgeted five to six hours to spray paint messages in Arabic on the grave markers. (In a notebook in the backpack found at the time of his arrest, the defendant had mapped out these messages on approximately 2,379 grave markers.) MELAKU further stated that he planned to leave the shell casings from the Fall 2010 shootings at the cemetery to demonstrate that it was the same person who committed the shootings and the desecration and to instill fear. The defendant stated that he decided to leave the ammonium nitrate at the cemetery, also to instill fear, but that if he had not left it, he might have decided subsequently to make a bomb with it. He specifically purchased a certain grade of ammonium nitrate because it was

"already ready to go."

Finally, on this same date, MELAKU stated that if he felt his message had not been received following the desecration at the Arlington National Cemetery, he planned to commit three more shootings of military buildings in Virginia and a fourth incident in which he would hijack a military fuel tanker truck and set it on fire in Maryland.

For all of the reasons below, the defendant should be sentenced to 25 years in accordance with his plea agreement with a recommendation for care or treatment in an inpatient psychiatric facility, such as a Bureau of Prisons Federal Medical Center.

## II. ARGUMENT

### A. The Sentencing Guidelines vs. Mandatory Minimums

The Supreme Court has directed that district courts "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 128 S. Ct. 586, 597 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Id.; see also Clark*, 434 F.3d at 685. Ultimately, the sentence imposed must meet a standard of reasonableness. *See Booker*, 543 U.S. at 260-61.

The defendant has pleaded guilty to three offenses, as enumerated above. Under the Sentencing Guidelines, the Total Offense Level is Level 17. United States Sentencing Commission, *Guidelines Manual* ("U.S.S.G."), Sections 2B1.5(a-b); 2B1.1(b)(1)(E). See May 30, 2012 Presentence Report ("PSR") by Senior U.S. Probation Officer Karen Moran, Worksheet A. The defendant is in Criminal History II, thus producing a Sentencing Guidelines range of 27-33 months. This is well below the 25-year sentence accepted by the parties and the Court in this

case. A Guidelines sentence, however, is not appropriate or reasonable here, for the following reasons.

For each of the three offenses to which MELAKU pleaded guilty – injury to property of the United States by shooting with a firearm and causing damage in excess of $1,000, in violation of 18 U.S.C. § 1361 (Count One); using, carrying and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Two); and attempted injury to veterans' memorials on property of the United States, in violation of 18 U.S.C. § 1369 (Count Three) – the maximum time to which the defendant could have been sentenced was ten years for each offense, for a total of 30 years. Had the defendant not accepted a pre-indictment plea, in addition to Counts One to Three, the government would have sought an indictment on eight additional counts related to the five shooting incidents. Among the total eleven counts would have been four § 924© offenses (one for each shooting on October 17, October 19, October 29 and November 1). Had the defendant been convicted, the first § 924© offense would have carried a mandatory minimum of ten years, because MELAKU discharged the weapon; while the additional three § 924© offenses would have resulted in a mandatory minimum of 25 years each, for a total sentence of 85 years. Thus on the four § 924© counts alone, MELAKU was facing a <u>mandatory minimum of 85 years' imprisonment</u>. (Add to that the possible sentence resulting from the additional eight counts of attempted destruction of veterans' memorials and destruction of property charges.) For this reason alone, the agreed sentence of 25 years is reasonable. In addition, the seriousness of the offenses and some of the other Section 3553 factors briefly addressed below further support a 25-year sentence.

B.      **Section 3553(a) Factors**

Section 3553(a) requires a sentencing court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Nature and Circumstances of the Offense*: Applying these sentencing factors to this case demonstrates that a sentence of 25 years' incarceration is appropriate and reasonable. As outlined in Section A above, on five separate occasions during the nighttime and in a number of locations throughout the Eastern District, MELAKU fired multiple rounds from a 9mm semi-automatic pistol at various military-related buildings. These were extremely dangerous acts with a powerful weapon. At the Pentagon, for example, people work around the clock. Under these circumstances, it is surprising and fortunate for the defendant that no one was injured in these five shootings.

*History and Characteristics of the Defendant*: The defendant is a 24-year-old naturalized national with minor criminal history in the United States. As stated above, the defendant falls within Criminal History Category II, and with an offense Level 17, would be subject to a Guidelines range of 27-33 months. However, as also stated above, the defendant faced a mandatory minimum term of 85 years had he gone to trial. As a result, the Guidelines <u>do</u> <u>not</u> properly account for the seriousness of the defendant's criminal behavior.

Moreover, MELAKU carefully planned his actions in committing and attempting to cover

up these offenses. As outlined in Section C above, he targeted military-associated buildings in the Fall 2010 shootings in order to send a message that the U.S. should not be involved in the Iraq and Afghanistan wars, and to intimidate those who supported U.S. involvement. Following the shootings in the Fall of 2010, MELAKU cut up the barrel of the 9mm gun he used, scattered the pieces in a number of drains, and resold the gun with a new barrel. He also sold the car he used. On June 17, 2011, MELAKU planned to desecrate approximately 2,379 grave markers of Iraq and Afghanistan war veterans at Arlington National Cemetery, by spray painting Arabic messages on them, because he did not agree with U.S. involvement in those wars. He brought the shell casings and the ammonium nitrate to leave at the cemetery in order to instill fear in the public. The defendant planned further offenses, including blowing up a military fuel truck, if his message was not heard.

Accordingly, considering both the seriousness of the offense and the history and characteristics of the defendant, the government requests a sentence of 25 years in accordance with the plea entered by the defendant and this Court.

   **C.  The FCC-Butner Report Recommends Sentencing**

The FCC-Butner report does not require any delay in sentencing. As stated above, the FCC-Butner report indicates that despite its conclusion that the defendant needs treatment for a mental illness, the defendant should be sentenced. According to the December 10, 2012 cover letter by Craig Apker, Complex Warden, FCC-Butner, the defendant "is currently in need of custody and care or treatment in a suitable facility, and may be returned to Court for sentencing." The FCC-Butner report itself states, "Mr. Melaku is ready to be returned to Court." Id. At 15. Moreover, the defendant himself apparently stated during an interview at Butner that "he would

be willing to consider treatment after he is sentenced and designated to a prison." Id. at 12. The FCC-Butner report even states that delayed treatment could adversely affect the defendant. Id. at 15. Therefore, in the interests of justice as well as the defendant, the government asks that this Court sentence the defendant to 25 years, with a recommendation for care or treatment in an inpatient psychiatric facility, such as a Bureau of Prisons Federal Medical Center.

## CONCLUSION

Therefore, for the above-stated reasons, the United States respectfully requests that the defendant be sentenced to 25 years in accordance with his plea agreement, the FCC-Butner report, and the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

NEIL H. MACBRIDE
United States Attorney

    /s/
LYNN E. HAALAND
W. NEIL HAMMERSTROM, JR.
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Telephone:  703-299-3700

CERTIFICATE OF SERVICE

      I hereby certify that on this 4th day of January, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Geoffrey P. Gitner, Esq.
Martin & Gitner, PLLC
2121 K Street, N.W., Suite 850
Washington, D.C. 20037
geoff.gitner@martingitnerlaw.com

                                                  /s/
                                    Lynn E. Haaland
                                    Assistant United States Attorney
                                    United States Attorney's Office
                                    Justin W. Williams U.S. Attorney's Building
                                    2100 Jamieson Avenue
                                    Alexandria, Virginia 22314
                                    Telephone:  703-299-3700